# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ANURAG MEHTA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0355-KSJM |
| | ) | |
| MOBILE POSSE, INC., a Delaware | ) | |
| corporation, JONATHAN JACKSON, | ) | |
| STEVEN J. MURRAY, | ) | |
| CHRISTOPHER H. HOLDEN, JOHN | ) | |
| L. DAVIES and THOMAS D. | ) | |
| ROBERTS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 7, 2019
Date Decided: May 8, 2019

Marcus E. Montejo, John G. Day, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; *Counsel for Plaintiff Anurag Mehta.*

Rafael X. Zahralddin, Jonathan M. Stemerman, ELLIOTT GREENLEAF, P.C., Wilmington, Delaware; *Counsel for Defendants Mobile Posse, Inc., Johnathan Jackson, Steven J. Murray, Christopher H. Holden, John L. Davies, and Thomas D. Roberts.*

**McCORMICK, V.C.**

The plaintiff was a common stockholder of Mobile Posse, Inc. Mobile Posse's management completed a buy-out of the company in the spring of 2018. Directors appointed by the preferred stockholders negotiated the merger; the preferred stockholders approved the merger by written consent. The merger consideration was below the preferred stockholders' combined liquidation preference, so the common stockholders received no consideration. Before this litigation, the common stockholders also received little information regarding the merger.

In completing the merger, Mobile Posse and its board had to satisfy basic requirements imposed by Delaware law. For example, Section 262 of the Delaware General Corporation Law ("DGCL") required that the company inform stockholders of their appraisal rights within ten days of the consummation the merger. Section 228 of the DGCL required that the company, when acting through written stockholder consent, promptly notify the stockholders who did not consent. Section 251 of the DGCL required that the merger agreement state the terms and conditions of the merger, including the cash stockholders would receive in exchange for their shares.

The complaint in this case reads like a law school exam designed to test a student's knowledge of these and other basic legal requirements for consummating the merger. The defendants, Mobile Posse and its board, would not have done well on that exam. The defendants failed to notify stockholders of their appraisal rights

1

within the timeframe set by Section 262. They forgot to send prompt notice of the written stockholder consents as required by Section 228. They neglected to include the amount of cash the preferred stockholders would receive for their shares on the face of the merger agreement or documents it incorporates as required by Section 251. The complaint alleges counts under each of these three statutory provisions and further asserts three additional counts. The additional counts claim that: the stockholder consents did not have a ratifying effect under Section 144 of the DGCL; the director defendants breached the fiduciary duty of disclosure; and the director defendants breached the fiduciary duty of loyalty because the merger was a self-dealing transaction and not entirely fair.

Through this litigation, the defendants became aware of many of their mistakes. They attempted to correct some by disseminating a supplemental notice. That supplement attached a document discussing some other state's appraisal laws.

Although the defendants candidly admit to having neglected many of their obligations in connection with the merger and related transactions, they have moved for judgment on the pleadings. They argue that they are entitled to judgment on the pleadings because the violations were remedied by the supplemental notice or caused no harm. They also contend that one of the plaintiff's claims relies on an outdated version of Section 228. On the last point only, the defendants are entitled to judgment on the pleadings. This decision denies rest of the defendants' motion.

2

## I.   FACTUAL BACKGROUND

The facts are drawn from the complaint and the documents it incorporates. The defendants urge the Court to also consider facts contained in documents, such as the supplemental notice, that they attach to their answer.

"There appears to be a split in authority . . . regarding [whether courts can consider] documents attached to the answer but not referenced in or attached to the complaint."[1]  The weight of authority, and the only Delaware decision addressing the issue, favors considering attachments to the answer, at least for limited purposes.[2]  Most decisions addressing this issue are based on Federal Rule of Civil

---

[1] 5C Charles Alan Wright et al., *Federal Practice and Procedure* § 1371 (3d ed. 2019). *See also Thomas v. Fin. Recovery Servs.*, 2013 WL 387968, at *2 (C.D. Cal. 2013) ("[T]here is some disagreement among courts regarding whether documents attached to the answer, rather than the complaint, may be properly considered." (citations omitted)).

[2] *See Ketler v. PFPA, LLC*, 2015 WL 3540187, at *1 (Del. Super. June 3, 2015) (considering document attached to answer and stating "[e]xhibits to pleadings are considered part of the pleadings and therefore this motion does not convert to one for summary judgment"), *aff'd*, 132 A.3d 746 (Del. 2016).  *Compare Barnard v. Lackawanna Cty.*, 696 F. App'x 59, 61 (3d Cir. 2017) ("Because the exhibits concisely set out the parties' respective rights and the record of the underlying dispute, they are 'documentary evidence' constituting 'written instruments' of the kind contemplated by Rule 10(c), and we find no error in the Court's consideration of their contents."), *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009) ("Because this matter comes to us on appeal from a judgment on the pleadings, we rely on the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." (citation omitted)), *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002) (holding court can consider documents attached to answer if they are "central to one of the [plaintiff's] claims and its authenticity is undisputed"), *and N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998) ("The pleadings include the complaint, the answer, and any written instruments attached as exhibits." (citation omitted)), *with Toliver v. City of New York*, 2012 WL 7782720, at *4 (S.D.N.Y. Dec. 10, 2012) (refusing to consider documents attached to answer because it was "not

Procedure 10(c), which provides that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."[3]  This Court's rules contain nearly identical language.[4]  Because "[d]ecisions interpreting the Federal Rules of Civil Procedure are usually of great persuasive weight in the construction of parallel Delaware rules,"[5] the Court will consider the exhibits attached to the defendants' answer.  Still, because all inferences from the pled facts must be made in a light most favorable to the non-moving party, the Court does not rely on those exhibits that contradict the complaint's well-pled facts.[6]

---

clear that [the plaintiff] would be unable to rebut the information from such documents through discovery"), *report & recommendation adopted*, 2013 WL 1155293 (S.D.N.Y. Mar. 21, 2013), *and Clark v. Chase Home Fin., LLC*, 2008 WL 2326307, at *4 (S.D. Cal. June 3, 2008) (refusing to consider 12(c) motion based on arguments concerning interpretation of contract attached to answer, rather than complaint).

[3] Fed. R. Civ. P. 10(c).

[4] Ct. Ch. R. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part therefor for all purposes.").  Delaware's Superior Court contains identical language in its rules.  Del. Super. Ct. Civ. R. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").  In applying Rule 10(c), the Superior Court considered attachments to the answer to resolve a motion for judgment on the pleadings.  *See Ketler*, 2015 WL 3540187, at *1.

[5] *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1191 n.11 (Del. 1988).  *See also Plummer v. Sherman*, 861 A.2d 1238, 1242 (Del. 2004) ("We note at the outset that the Delaware Rules of Civil Procedure are patterned after the Federal Rules of Civil Procedure. We therefore find certain federal cases appropriate for determining the proper interpretation of the Delaware Rules of Civil Procedure." (footnote and citations omitted)).

[6] *See, e.g.*, *Hatch v. DeMayo*, 2018 WL 6003548, at *2 (M.D.N.C. Nov. 15, 2018) ("Because the plaintiff is not required to reply to the Answer, 'all allegations in the [A]nswer are deemed denied.' . . . The defendant cannot therefore 'rely on allegations of fact contained only in the [A]nswer, including affirmative defenses, which contradict Plaintiffs' complaint.'" (quoting *Jadoff v. Gleason*, 140 F.R.D. 330, 331 (M.D.N.C. 1991)); *Stokes v. City of Visalia*, 2018 WL 2970765, at *4 (E.D. Cal. June 8, 2018) ("In deciding

4

## A. Mobile Posse's Business and Board

Defendant Johnathan Jackson founded Mobile Posse (or the "Company") in 2005. The Company provides mobile advertising and customer-relationship-management solutions on mobile devices. Its main software product is pre-installed on mobile devices, and that software and related services provide content and advertising on those devices. The Company's platform reaches seven operating systems and nearly twenty million active consumers. The Company's business model is risky; the Company has only one customer and that customer could terminate its contract for convenience. If that customer terminated the contract, or simply did not renew it, "the Company would most likely need to liquidate its assets."[7]

The Company raised over $25 million in capital through six series of preferred stock (Series A, A-1, B, B-1, B-2, and C). The preferred stock entitled holders to

---

a motion for judgment on the pleadings, the court accepts as true all allegations in the complaint and treats as false those allegations in the answer that contradict the complaint." (citations omitted)); *Allen v. Eckard*, 2018 WL 2113234, at *1 (M.D. Pa. May 8, 2018) ("As a result of the obligation to view the facts and reasonable inferences in favor of the nonmovant, however, a court should 'treat[ ] any allegations in the answer that contradict the complaint as false.'" (alteration in original) (quoting *Goodman v. Williams*, 287 F. Supp. 2d 160, 161 (D.N.H. 2003)). *See also Cell Therapeutics, Inc. v. Lash Gp., Inc.,* 586 F.3d 1204, 1206 n.2 (9th Cir. 2009) ("In reviewing the district court's grant of judgment on the pleadings, we accept as true all allegations in [the] complaint and treat as false those allegations in the answer that contradict [the complaint's] allegations.").

[7] C.A. No. 2018-0355-KSJM Docket ("Dkt.") 14, Defs.' Am. Answer ("Am. Ans.") Ex. 1 (Suppl. Notice) at 3.

liquidation preferences and voting rights, such as the right to approve a sale of the Company. The waterfall of proceeds provided a liquidation preference of 100% of the amount invested by the junior preferred stockholders, and 125% for the senior series of preferred stock. Dividends of eight percent a year also accrued first to senior preferred stock, and then to junior holders, adding "in excess of $2,000,000 to these liquidation preferences on an annual basis."[8] As of April 3, 2018, the accrued dividends totaled $17,003,591 and liquidation preferences totaled approximately $44,678,801.[9]

Mobile Posse's Board of Directors comprised Jackson and persons affiliated with the preferred stockholders: John L. Davies, Christopher H. Holden, Steven J. Murray, and Thomas D. Roberts. These directors and their affiliates held most or all of the Company's outstanding preferred stock and a majority of the Company's outstanding voting power.

### B. The Company's Sale Efforts

Beginning in December 2014, the board began to explore a sale of the Company. The Company engaged Headwaters BD LLC to conduct the sale process. Headwaters contacted approximately 120 potential strategic buyers. In December 2016, Mobile Posse executed a letter of intent to sell to a strategic buyer for

---

[8] *Id.* at 2.

[9] *Id.* at 2–3.

approximately $45,000,000, with another $17,000,000 as part of a potential earn-out. Common stockholders would have received none of the $45,000,000 closing payment, though they could have potentially received $0.38 per share through the earn-out. That buyer eventually walked away from the deal "in the Spring of 2017 due to concern that the Corporation only had one customer."[10]

In June 2017, the Company engaged a new investment banker, Canaccord Genuity. Canaccord contacted approximately 170 potential strategic and financial buyers, but received only one expression of interest. That potential financial buyer "submitted an indication of interest in September 2017 to acquire the Corporation for an enterprise value between $31,000,000 and $37,000,000, subject to due diligence."[11] Mobile Posse went forward with due diligence, although the offer would not have satisfied the Corporation's preferred stock. This buyer too backed out during due diligence "because of similar concerns that the Corporation's business depended on a single customer."[12]

## C. The Merger

In January 2018, in the wake of the Company's two failed processes, management members offered to purchase the Company for $33,100,000 in cash and

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

$1,000,000 in rollover equity. Also, the Company had instituted a management carve-out plan "that called for up to 16% of the proceeds from a Change in Control event . . . to be paid to certain executives and management of the Corporation."[13] Under the carve-out, management would receive $5,900,000.[14] The Board countered at $35,500,000 cash, up to $1,000,000 in rollover equity, and management forfeiting its rights to a carve-out payment.

The Board formed a special committee of directors who would not be receiving rollover equity. After several weeks of negotiations, the parties agreed to terms of a merger (the "Merger"). Under the Merger, the purchasers would pay $33,800,000, including $1,000,000 in rollover equity.[15] Management would receive no carve-out of Merger proceeds. And senior preferred stockholders forewent a portion of their liquidation preference to enable lower classes of preferred stock to receive consideration.

Common stockholders would receive nothing because the purchase price was less than the preferred stockholders' $44 million liquidation preference.[16]

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] Accounting for investment banking and transaction fees, Defendants say the sale price at which common stockholders would start to receive consideration was approximately $53,189,000. Am. Ans. Ex. 1 (Suppl. Notice) at 6; Dkt. 16, Defs.' Opening Br. in Supp. of their Mot. for J. on the Pleadings ("Defs.' Opening Br.") at 17.

8

Defendants sought the written consent of preferred stockholders, but did not provide the consent solicitation and information statement to Mobile Posse's twenty common stockholders.

### D. The 280G Solicitation

Certain payments due to Jackson and Chief Financial Officer Stephen Sincavage upon consummation of the Merger exceeded 2.99 times their base amount in recent years. Under Section 280G of the Internal Revenue Code, those payments were "parachute payments" that Mobile Posse could not deduct, and on which the recipients would pay an excise tax. Mobile Posse could avoid this outcome under Section 280G by obtaining the approval of 75% of the holders of all outstanding stock. Around March 28, 2018, the Company issued a solicitation seeking stockholder consents pursuant to Section 280G (the "280G Solicitation").[17]

Plaintiff Anurag Mehta ("Plaintiff") is a former employee of Mobile Posse who owned 240,000 shares of Mobile Posse common stock. He received the 280G Solicitation. The solicitation mentioned, but did not describe, the Merger. That mention was the first time Plaintiff learned of the Merger. The 280G Solicitation stated that the executing stockholder adopted and approved the resolution "effective

---

[17] Dkt. 1, Pl.'s Verified Compl. ("Compl.") Ex. E (280G Solicitation) Ex. A at 1.

9

as of March 28, 2018."[18]  Stockholders approved the 280G Solicitation.  On April 2, the Company's preferred stockholders approved the Merger by written consent.

### E.     The Initial Notice

After receiving the Section 280G Solicitation, Plaintiff attempted to obtain more information about the Merger.  The Company did not respond to Plaintiff's inquiry until April 19 when it emailed him a notice and the stockholder merger resolution (the "Initial Notice").[19]  The Initial Notice said that stockholders had consented to and that the Company had consummated the Merger.  The Initial Notice did not contain any information about what consideration any stockholders, common or preferred, would receive.  The Company did attach the Merger Agreement, which referenced a payment schedule (the "Payment Schedule").  But the Payment Schedule was not included.  The Initial Notice was also light on details about appraisal rights, telling stockholders that if they did not vote for the Merger they may obtain the fair value of their shares.  It did not attach the appraisal statute, although on its face it purported to do so.  It did not inform the stockholders of any procedures for asserting their appraisal rights.

---

[18] Compl. Ex. E (280G Solicitation) at 1.

[19] Compl. Ex. A (Initial Notice).

### F. The Litigation and Supplemental Notice

Plaintiff commenced this litigation on May 18, 2018. His claims alerted the Company to multiple deficiencies in the Initial Notice. In response to the complaint, the Company issued a supplemental notice on June 19, 2018 (the "Supplemental Notice"). The Supplemental Notice contained ten separate documents, attached to the Amended Answer as Exhibits 1 through 10. It disclosed information including the availability of appraisal rights, the rights of preferred stockholders, the Payment Schedule, and the background of the sales process that led to the Merger.

Defendants answered and asserted affirmative defenses on July 11, 2018. Defendants filed an amended answer attaching numerous exhibits, including the Supplemental Notice, on October 5, 2018. Defendants contemporaneously moved for judgment on the pleadings. After briefing, the Court heard oral argument on February 7, 2019.

## II. LEGAL ANALYSIS

The Complaint asserts six causes of action. Count I alleges that Defendants violated 8 *Del. C.* § 262 by failing to provide statutorily required information concerning appraisal rights. Count II alleges that the 280G Solicitation violated 8 *Del. C.* § 228 by failing to disclose material facts necessary for stockholders to decide whether to execute the written consents. Count III alleges that the Initial Notice does not give rise to the safe harbor protections of 8 *Del. C.* § 144, and

violated the "prompt" notice requirements of 8 *Del. C.* § 228.  Count IV alleges that Defendants violated 8 *Del. C.* § 251 by failing because the Merger Agreement fails to state the consideration paid to stockholders.  Count V alleges that the director defendants breached the fiduciary duty of disclosure by failing to meet the statutory requirements of 8 *Del. C.* §§ 228 and 262.  Count VI alleges that the director defendants breached their fiduciary duty of loyalty by engaging in a self-dealing transaction that was not entirely fair.

Defendants moved for judgment on the pleadings on each of the six Counts.  In deciding a motion for judgment on the pleadings under Court of Chancery Rule 12(c) the Court "accord[s] plaintiffs opposing a Rule 12(c) motion the same benefits as a plaintiff defending a motion under Rule 12(b)(6)."[20]  This means the Court "view[s] the facts pleaded and the inferences drawn from such facts in a light most favorable to the non-moving party.  The Court must take the well-pleaded facts alleged in the complaint as admitted."[21]

"A motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law."[22]  Because "the standards for motions under both Rule 12(b)(6) and Rule 12(c)

---

[20] *McMillan v. Intercargo Corp.*, 768 A.2d 492, 500 (Del. Ch. 2000).

[21] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993) (citations omitted).

[22] *Id.* (citations omitted).

are almost identical"[23] a motion for judgment on the pleadings can only be granted against a plaintiff if she "could not recover under any reasonably conceivable set of circumstances susceptible of proof."[24]

## A. Count I: Appraisal Disclosures

Section 262(d)(2) requires that "within 10 days [of the merger the surviving corporation] shall notify each of the holders of any class or series of stock . . . who are entitled to appraisal rights of the approval of the merger . . . and that appraisal rights are available for" their shares.[25] The notice "shall include" a copy of Section 262.[26]

Defendants admit that twenty minority stockholders did not receive notice of their appraisal rights within the period specified by Section 262.[27] Defendants argue, however, that the Supplemental Notice constituted a "replicated remedy" resetting

---

[23] *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 1456494, at *4 (Del. Ch. Nov. 5, 2001).

[24] *MPT of Hoboken TRS, LLC v. HUMC Holdco, LLC*, 2014 WL 3611674, at *5 (Del. Ch. July 22, 2014) (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011)).

[25] 8 *Del. C.* § 262(d)(2).

[26] *Id.*

[27] Defs.' Opening Br. at 23 ("There is no dispute that the 20 Minority Stockholders did not receive the Notice.").

the clock, permitting the common stockholders to exercise their appraisal rights, and entitling Defendants to judgment in their favor on Count I.[28]

Defendants' replicated remedy theory comes from *Berger v. Pubco Corp.*[29] In that case, the Court found that disclosures regarding a short-form merger provided inadequate detail and attached an outdated version of the appraisal statute.[30] On appeal, the Supreme Court discussed "[i]n the abstract," four theoretical "remedial alternatives" for addressing deficient disclosures concerning stockholder appraisal rights.[31] One of the remedial alternatives involved a "'replicated appraisal' proceeding that would duplicate the precise sequence of events and requirements of the appraisal statute."[32] No one advocated for this relief, and the Supreme Court did not award it. Indeed, the Supreme Court was critical of its own theoretical brainchild. The Court described a "replicated appraisal remedy" as suboptimal for many reasons, including that it would give fiduciaries "little incentive to observe their disclosure duty in future cases, since the cost of the remedy [] would be

---

[28] *Id.* at 25. Defendants' argument resembles a mootness argument, though Defendants do not cast it as such. Their argument is essentially that they mooted the initial statutory violation by giving stockholders the same opportunity at a later date.

[29] 976 A.2d 132 (Del. 2009).

[30] *Id.* at 135.

[31] *Id.* at 139–40.

[32] *Id.* at 139.

14

negligible."[33] Defendants cite no decision that blesses this replicated remedy as an appropriate fix to an improper notice under Section 262. That is no surprise, because "fairness requires that the corporation be held to the same strict standard of compliance with the appraisal statute as the minority shareholders."[34]

Even if a replicated appraisal remedy was a legally viable option, the Company's attempt to invoke it fails. The Supplemental Notice itself (Exhibit 1 to the Amended Answer) contained correct information, but it attached a document (Exhibit 3 to the Amended Answer) that contained incorrect information. The document as a whole, therefore, contained incorrect and internally inconsistent instructions. Two glaring errors are particularly problematic.

*First*, Section 262 requires that a stockholder assert appraisal rights "*within 20 days* after the date of mailing" of the appraisal notice.[35] The Supplemental Notice attached a copy of the statute, and the cover letter to the Supplemental Notice correctly stated the Company's intent to permit each stockholder the option of exercising appraisal rights "*within 20 days* of the mailing of this notice."[36] The

---

[33] *Id*. at 142.

[34] *Id*. at 144. *See also Jackson v. Turnbull*, 1994 WL 174668, at *6 (Del. Ch. Feb. 8, 1994) ("Our Supreme Court has emphasized the need for stockholders to strictly comply with the formalities of § 262 when seeking to exercise their appraisal rights. Corporations should be held to the same standard." (citation omitted)).

[35] 8 *Del. C.* § 262(d)(2) (emphasis added).

[36] Am. Ans. Ex. 1 (Suppl. Notice) at 6 (emphasis added).

15

March 28, 2018 notice, which was attached to the Supplemental Notice, stated that the Company would set "a date by which [it] must receive the demand for payment (which date may *not be fewer than 30 nor more than 60 days after the Dissenters' Notice is delivered*)."[37] The thirty-to-sixty day window is not Delaware law.[38] Had stockholders complied with that deadline, they would have missed the twenty-day "replicated" period for submitting their demand.

*Second*, the March 28, 2018 notice told stockholders the wrong procedures for enforcing their appraisal rights. The process described in that document starts with an "Offer of Payment," which obligated the surviving corporation "to pay to each dissenting shareholder . . . the amount the Company estimates to be the fair value of the shares, plus accrued interest from the effective date of the Merger."[39] After making that offer, and providing other information,[40] the dissenting stockholder could accept the offer or within 30 days provide "his or her own estimate of the fair

---

[37] Am. Ans. Ex. 3 (Mar. 28, 2018 Notice) at 9 (emphasis added).

[38] The Model Business Corporations Act uses a similar window, though the date the corporation must receive the form "may not be fewer than 40 nor more than 60 days after the date the [] appraisal notice is sent[.]" Model Bus. Corp. Act § 13.22(b)(2)(ii) (2016). Other states have provided for the thirty-to-sixty day window Mobile Posse used, including Virginia, where Mobile Posse keeps its principal place of business. Va. Code Ann. § 13.1-734(B)(2)(b) (amended 2019).

[39] Am. Ans. Ex. 3 (Mar. 28, 2018 Notice) at 10–11.

[40] This information would include "1. recent financial statements of the Company; 2. the Company's estimate of the fair value of the shares; 3. an explanation of how the interest was calculated; 4. a statement of the dissenter's right to demand payment under Section 262 of the DGCL; and 5. a copy of Section 262 of the DGCL." *Id*.

value for the dissenting holder's shares and the interest due, and may demand payment of such holder's estimate."[41] If after this back and forth process the demands for appraisal "remain[ed] unsettled, the Company must commence a nonjury equity valuation proceeding in the [Court of Chancery, Wilmington, Delaware], within 60 days after receiving the payment demand and must petition the court to determine the fair value of the shares and accrued interest."[42] The Company would then "make all dissenting stockholders whose demands remain unsettled parties to the proceeding and to serve a copy of the petition upon each of them."[43] If the Company "does not commence the proceeding within those 60 days . . . the Company [would] pay each dissenting stockholder whose demand remains unsettled the amount demanded."[44]

None of this is Delaware law or procedure. Section 262 does not describe this process.[45] Section 262 tells stockholders they can "commence an appraisal proceeding by filing a petition in the Court of Chancery . . . [w]ithin 120 days after the effective date of the" deal.[46] There is no required back and forth, offer of

---

[41] *Id.*

[42] *Id.* at 11.

[43] *Id.*

[44] *Id.*

[45] The Model Business Corporation Act does. *See* Model Bus. Corp. Act § 13.24.

[46] 8 *Del. C.* § 262(e).

17

payment from the corporation, or period where the stockholders sit back and wait for the corporation to start the proceeding, which if it never does, they will be paid their demand. Mobile Posse informed its stockholders of incorrect procedures.

"The purpose of the requirement that a copy of the appraisal statute be included in the Notice is to enable shareholders to make an informed decision whether to accept the merger consideration or to seek appraisal."[47] Plaintiff has pled it is reasonably conceivable that a corporation does not satisfy Section 262 by attaching a correct copy of the statute but then telling stockholders information and procedures that contradict the statute.

## B. Count II: The 280G Solicitation

Count II asserts that the 280G Solicitation violated 8 *Del. C.* § 228 by including a pre-printed effective date and by failing to disclose material facts to the stockholders.

### 1. Section 228 Form Dating Issues

The 280G Solicitation, which Plaintiff attached to his Complaint, states that the signing stockholder "hereby adopt[s] and approve[s] the following recitals and by written consent, effective as of March 28, 2018."[48] Based on *H-M Wexford LLC*

---

[47] *Nebel v. Sw. Bancorp, Inc.*, 1995 WL 405750, at *7 (Del. Ch. July 5, 1995). *See also Gilliland v. Motorola, Inc.*, 859 A.2d 80, 86 (Del. Ch. 2004) ("The statutory duty is mainly to notify the stockholders of the merger and of their appraisal remedy, and was satisfied by the Notice.").

[48] Compl. Ex. E (280G Solicitation) at 1; *see also* Compl. ¶¶ 45–46.

*v. Encorp, Inc.*,[49] Plaintiff argues "stockholder consents cannot be form dated but rather must bear the date of the stockholder's signature."[50]

*H-M Wexford* interpreted language in Section 228 removed by amendment. Before the amendment, Section 228 required that "[e]very written consent shall bear the date of signature of each stockholder or member who signs the consent."[51] The mandatory use of "shall" meant that the "pre-printed date" on the consents were insufficient, and each signer needed to date their consent.[52] The August 2017 amendment struck the "shall bear the date of signature" language relevant to the *H-M Wexford*.[53] The synopsis to the bill confirms: "Section 228 is amended to provide that a consent need not bear the date of signature of the stockholder or member signing the consent."[54] Plaintiff is thus wrong that the consents must bear the date of signature. Defendants are entitled to judgment on the pleadings on this issue.[55]

---

[49] 832 A.2d 129, 151 (Del. Ch. 2003).

[50] Dkt. 22, Pl.'s Answering Br. in Opp'n. to Defs.' Mot. for J. on the Pleadings at 20.

[51] *H-M Wexford*, 832 A.2d at 151.

[52] *Id.*

[53] *See* Edward P. Welch, et al., 2 *Folk on the Delaware General Corporation Law* § 228.04 at 7-332 (6th ed. Supp. 2018) ("In 2017, section 228(c) was amended to dispense with the requirement that each consent bear the date of signature of the stockholder executing the consent.")

[54] 2017 Del. Laws 86 (S.B. 69) § 8 (2017), *available at* https://legis.delaware.gov/BillDetail?LegislationId=25730.

[55] To be sure, the effective date was misstated on the face of the written consent. "Action by written consent is effective under the statute only if a number of consents sufficient to take the action are delivered to the corporation within sixty days of the earliest dated consent." *Kerbawy v. McDonnell*, 2015 WL 4929198, at *12 (Del. Ch. Aug. 18, 2015);

19

## 2. Section 228 Disclosure Violations

Plaintiff argues that Defendants did not disclose all material information required by 8 *Del. C.* § 228 for stockholders to decide whether to execute the 280G Solicitation.

This Court has allowed stockholders to state a claim under 8 *Del. C.* § 228 based on the failure to disclose information,[56] although Section 228 "contains no disclosure requirements other than that the written consents be in writing, set forth the action to be taken, and be signed by the holders of the stock."[57] This is because "actions under Section 228 require strict compliance to avoid mischief and disorder in corporate actions."[58]

---

*see* 8 *Del. C.* § 228(c) ("No written consent shall be effective to take the corporate action referred to therein unless written consents signed by a sufficient number of holders or members to take action are delivered to the corporation in the manner required by this section within 60 days of the first date on which a written consent is so delivered to the corporation."). Stockholders can even provide "that such a consent will be effective at a future time (including a time determined upon the happening of an event)[.]" 8 *Del. C.* § 228(c). But nothing in the DGCL allows the corporation or stockholders to make the effective date retroactive, and no decisions have blessed doing so. Plaintiff's *H-M Wexford* argument, however, does not speak to this issue, and the Company does not seek to enforce the misstated "effective" date.

[56] *See Calesa Assocs., L.P. v. Am. Capital, Ltd.*, 2016 WL 770251, at *14 (Del. Ch. Feb. 29, 2016) (denying motion to dismiss where documents stockholders were asked to sign were incomplete, missing attachments, or in draft form); *Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697, at *6 (Del. Ch. May 22, 2009) (refusing to "delineate the parameters of the disclosure required by § 228(e)" but denying motion to dismiss where plaintiff adequately pled directors deliberately omitted material information to mislead stockholders).

[57] *Unanue v. Unanue*, 2004 WL 5383942, at *8 (Del. Ch. Nov. 9, 2004).

[58] *Calesa*, 2016 WL 770251, at *14. In line with the previous decisions that declined to answer "the question of whether the notice required by 8 *Del. C.* § 228(e) triggers a fulsome

The 280G Solicitation asked stockholders to approve executive compensation related to the Merger. One of the resolutions even states that "the undersigned Stockholders acknowledge and agree that this Action by Written Consent is entirely separate from the vote to approve the Merger . . . ."[59] The 280 Solicitation, however, fails to provide any information concerning the Merger, including the fact that the common stockholders would receive no consideration. Compounding this problem, Defendants concede they did not provide the consent solicitation related to the Merger to the common stockholders.[60] This meant that the common stockholders first learned of the Merger by reading the 280G Solicitation.[61]

This type of incomplete disclosure resembles those of two other decisions involving written consents, *Calesa Associates, L.P. v. American Capital, Ltd.*,[62] and *Carsanaro v. Bloodhound Technologies, Inc.*[63] In both cases, the written consents omitted important information referenced on the face of the consent. In *Calesa*, the documents the stockholders were asked to sign were incomplete, missing

---

disclosure akin to that required when stockholder approval is being solicited," *Dubroff*, 2009 WL 1478697, at *6, this ruling is limited to the narrow facts before the Court.

[59] Compl. Ex. E (280G Solicitation) at 2.

[60] Defs.' Opening Br. at 4.

[61] Compl. ¶ 21.

[62] 2016 WL 770251.

[63] 65 A.3d 618, 641 (Del. Ch. 2013) *abrogated on other grounds by El Paso Pipeline GP Co. LLC v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016).

attachments, or in draft form.[64]  In *Carsanaro*, several of the incorporated exhibits were missing in their entirety.[65]  By asking stockholders to approve of parachute payments in connection with the Merger, but providing them no information about the Merger, Defendants similarly erred.  Defendants are not entitled to judgment on Count II.

## C.  Count III:  The Initial Notice

Count III alleges that Defendants are not entitled to the protections of 8 *Del. C.* § 144(a)(2) because the Initial Notice failed to disclose material facts.  Count III also alleges that Defendants violated 8 *Del. C.* § 228 by failing to provide prompt notice of the action by written consent.

### 1.  Section 144's Safe Harbor

"Section 144 of the [DGCL] provides a safe harbor for interested transactions[.]"[66]  "A transaction is interested where directors appear on both sides of a transaction or expect to derive a financial benefit from it that does not 'devolve[ ] upon the corporation or all stockholders generally.'"[67]  At common law,

---

[64] 2016 WL 770251, at *14.

[65] 65 A.3d at 641.

[66] *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114, 120 (Del. 2006)

[67] *Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).

"a corporation's stockholders [had] the power to nullify an interested transaction."[68] The enactment of Section 144 of the DGCL changed this.[69] Under Section 144, a transaction will not be void or voidable based solely upon a director's or officer's interest if one of three conditions are met.[70] Only the second condition, Section 144(a)(2), is at issue in this case.

Section 144(a)(2) provides safe harbor where: "The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders[.]"[71]

---

[68] *Oberly v. Kirby*, 592 A.2d 445, 466 (Del. 1991). *See also* Balotti & Finkelstein, *supra*, § 4.16 ("At common law, interested-director transactions were voidable regardless of whether they were fair or approved by disinterested directors.").

[69] *See Oberly*, 592 A.2d at 466 ("The enactment of 8 *Del. C.* § 144 in 1967 limited the stockholders' power [to nullify interested transactions] in two ways."); *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 745 (Del. Ch. 2007) ("Before the 1967 enactment of 8 *Del. C.* § 144, a corporation's stockholders had the right to nullify an interested transaction." (citation omitted)). *See also Solomon v. Armstrong*, 747 A.2d 1098, 1115 (Del. Ch. 1999) ("Over the last century there has been a gradual shift in how the law has conceived of transactions between the corporation and its officers and directors and the type of recourse that shareholders have been entitled to in those instances."), *aff'd*, 746 A.2d 277 (Del. 2000).

[70] Welch, *supra*, 1 *Folk on the Delaware General Corporation Law* § 144.01 at 4-367–4-368 (6th ed. Supp. 2014). *See also Valeant*, 921 A.2d at 745 ("To ameliorate th[e] potentially harsh result [of the common law], section 144 as presently enacted provides three safe harbors to prevent nullification of potentially beneficial transactions simply because of director self-interest.").

[71] 8 *Del. C.* § 144(a)(2).

23

Count III claims that Section 144(a)(2) is not met because the Company failed to disclose "material facts in connection with the Board of Directors' relationships and interests in connection with the Merger, Merger Agreement and allocation of the $33.8 million merger consideration."[72]

The Initial Notice is deficient in many respects. It failed to disclose any information as to how and when the Merger came about and who received consideration in connection with the Merger. It is reasonable to infer that certain directors were conflicted as to the Merger—a management buy-out, which was negotiated by directors who were appointed to the board by preferred stockholders, and thus likely owed dual fiduciary duties to the Company and those stockholders. Based on the Initial Notice, it is reasonably conceivable to conclude—given the complete dearth of information provided concerning the Merger and the alleged conflicts among the board members—that disinterested stockholders voting on the Merger lacked the material facts required to invoke the protections of Section 144. Thus, at this stage, Defendants are not entitled to judgment in their favor on the Section 144 issues raised in Count III.

### 2. Section 228's Prompt Notice Provision

Section 228(e) of the DGCL requires that when corporate action is taken "without a meeting by less than unanimous written consent," the stockholders who

---

[72] Compl. ¶ 58.

did not consent must receive "[p]rompt notice."[73] "Prompt notice to the minority stockholders is of critical importance."[74] That is because "Section 228 ensures some level of transparency for non-consenting stockholders" and allows them to "stay abreast of corporate decision-making and maintain the accountability of boards of directors and controlling stockholders."[75]

"Prompt" under Section 228(e) is not defined by the statute. The only case construing the term concluded that a near five-month delay was not "prompt."[76] That case is not instructive here.

When a transaction approved by written consent triggers notice obligations under Section 262, the deadline in Section 262 should supply the outer bound of what constitutes "prompt" notice under Section 228.

---

[73] 8 *Del. C.* § 228(e).

[74] *Brown v. Kellar*, 2018 WL 6721263, at *10 (Del. Ch. Dec. 21, 2018).

[75] *Espinoza v. Zuckerberg*, 124 A.3d 47, 57, 65 (Del. Ch. 2015).

[76] *See Di Loreto v. Tiber Hldg. Corp.*, 1999 WL 1261450, at *5 (Del. Ch. June 29, 1999) ("I conclude that an unexplained five-month delay in informing the minority shareholders of Jeanne and Mary's written action, a period during which the deleted transfer restrictions were themselves the subject of litigation, is not prompt notice within the meaning of § 228."). The Court also dealt with a claim that notice was not prompt under the plaintiff-friendly temporary restraining order standard. *Elite Horse Invs. Ltd. v. T3 Motion, Inc.*, C.A. No. 10550-CB (Del. Ch. Jan. 23, 2015) (TRANSCRIPT). There, stockholder consents electing new directors were delivered less than thirty days before the hearing, and at that point there was still no notice. *Id*. at 73–74. The Court refused to invalidate the consents, stating "there's no authority cited anywhere in the ballpark of requiring such notice within a 30-day time frame[.]" *Id*. at 74.

25

In this case, the written consents were allegedly executed on April 2 (the date the Merger closed) and Plaintiff received written notice on April 19.[77] The more than two-week delay, along with the notice coming after the statutory period provided in Section 262, makes it reasonably conceivable that Plaintiff will be able to show the notice here was not in fact prompt. Defendants' motion for judgment on the pleadings on the Section 228 issues raised in Count III is denied.

### D.   Count IV:  The Merger Agreement

Count IV alleges that the Merger Agreement failed to set forth the terms and conditions of the Merger as required by 8 *Del. C.* § 251. Section 251(b)(1) requires that a merger agreement set forth "[t]he terms and conditions of the merger or consolidation."[78] Section 251(b)(5) states that a merger agreement shall state "[t]he manner, if any, of converting the shares of each of the constituent corporations . . . and, if any shares of any of the constituent corporations are not to remain outstanding . . . the cash . . . holders of such shares are to receive in exchange for . . . the surrender of any certificates evidencing them . . . ."[79]

The Merger Agreement did not set out the consideration into which the Company's preferred stock would be converted. It referenced a "Payment Schedule"

---

[77] Compl. Ex. A (Initial Notice) at 1.

[78] 8 *Del. C.* § 251(b)(1).

[79] *Id.* § 251(b)(5).

containing that information. The Payment Schedule was not attached to the Merger Agreement provided to common stockholders. It is reasonably conceivable that the Payment Schedule was not attached to the Merger Agreement because it was not prepared at the time the agreement was executed. It is therefore reasonably conceivable that the Merger Agreement lacked terms required by Section 251. At this procedural posture, the Court cannot consider Defendants' factual arguments to the contrary.[80]

Defendants respond that the lack of a Payment Schedule was of no consequence. This is so, Defendants say, because Section 1.6(b) of the Merger Agreement states that the common stockholders would receive no consideration,[81] and further provides that the preferred stockholders would receive consideration consistent with the "waterfall" priority of preferences contained in the certificate of incorporation.[82]

---

[80] Dkt. 24, Defs.' Reply Br. in Supp. of Their Mot. for J. on the Pleadings ("Defs.' Reply Br.") at 19 n.18.

[81] Compl. Ex. B (Merger Agr.) § 1.6(b)(ii) (providing that the Common Stock would be "be automatically cancelled and retired and shall cease to exist, and without any consideration payable therefor, and each holder . . . of Common Stock shall cease to have any rights with respect thereto").

[82] *Id.* § 1.6(b)(i) ("Each outstanding share of Company Preferred Stock will be converted automatically into the right to receive the consideration set forth on the Payment Schedule.").

Defendants' argument ignores an obvious problem. The preferred stockholders renegotiated the waterfall provisions when negotiating the Merger, and the Company's certificate of incorporation was amended prior to the consummation of the Merger to allow the new waterfall. As amended, however, the certificate of incorporation states that the proceeds will be allocated "*as set forth in the Merger Agreement*."[83] So the Merger Agreement references the certificate of incorporation, and the certificate of incorporation references the Merger Agreement. As a consequence, neither document contains the basic information required by Section 251(b)(5). Plaintiff has therefore stated a claim under Section 252(b), and Defendants are not entitled to judgment on the pleadings.

Plaintiff also alleges that Defendants violated Section 251(c), which mandates that "[t]he agreement required by subsection (b) of this section shall be submitted to the stockholders . . . for the purpose of acting on the agreement." Thus, if a merger agreement does not meet the standards of 251(b), then it also cannot satisfy 251(c). Accordingly, because Plaintiff's claim under Section 251(b) survives, so does Plaintiff's claim under Section 251(c).

### E.    Count V:  Breaches of the Fiduciary Duty of Disclosure

Count V claims that the director defendants breached their fiduciary duty of disclosure because the Company failed to comply with statutory notice provisions.

---

[83] Compl. Ex. C (Certification of Incorporation) § 3(1)(i) (emphasis added).

Statutory and fiduciary disclosure obligations overlap.  Information required by the DGCL is *per se* material and failing to disclose the statutorily required information can constitute a fiduciary breach.[84]    Sending an appraisal notice implicates the "fiduciary duty to disclose all material information with respect to the [stockholder's] decision whether or not to seek appraisal."[85]  This includes "financial information about the company that will be material to" the stockholder's decision of accepting merger consideration or pursuing appraisal.[86]  And a company has "an

---

[84] *See Berger*, 976 A.2d at 134–36 (affirming finding that failure to satisfy requirement of Section 262 constituted material disclosure violation); *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 19 (Del. Ch. 2014) ("The DGCL does not require that stockholders receive many items of information, but those that it does require are material *per se*."); *Gilliland*, 859 A.2d at 86 ("This duty is two-fold.  First, the majority shareholder has a statutory duty to apprise the stockholders of their right to an appraisal, the effective date of the merger, and to provide a copy of section 262 . . . Second, and more pertinently, the majority shareholder has a common law fiduciary duty of providing substantive, financial information relating to the value of the company." (citations and footnotes omitted)); *Nebel*, 1995 WL 405750, at \*6 (rejecting argument that attaching copy of appraisal statute was immaterial information because of "the mandatory nature of the statutory requirement").

[85] *Berger v. Pubco Corp.*, 2008 WL 2224107, at \*1 (Del. Ch. May 30, 2008), *rev'd on other grounds*, 976 A.2d 132 (Del. 2009).  *See also Turner v. Bernstein*, 1999 WL 66532, at \*5 (Del. Ch. Feb. 9, 1999) (stating "the directors of a constituent corporation whose shareholders are to vote on a proposed merger, have a fiduciary duty to disclose to the shareholders the available material facts that would enable them to make an informed decision, *pre-merger,* whether to accept the merger consideration or demand appraisal" (emphasis original)); *Seagraves v. Urstact Prop. Co.*, 1996 WL 159626, at \*5 (Del. Ch. Apr. 1, 1996) ("Delaware law imposes a fiduciary obligation to disclose all material information that would affect a minority stockholder's decision whether to accept the merger consideration or to seek an appraisal or other available litigation remedy."); Balotti & Finkelstein, *supra*, § 9.44[B] ("The directors of a corporation whose stockholders are entitled to appraisal rights also must fulfill their fiduciary duty of disclosure in the context of the merger." (citation omitted)).

[86] *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000).

obligation to issue specific instructions to its stockholders as to the correct manner of executing and filing a valid objection or demand for payment under the Statute, as construed by Delaware courts[.]"[87]

Because Plaintiff has sufficiently pled that notice pursuant to Section 262 was deficient, he has also sufficiently pled that the director defendants breached their fiduciary duty of disclosure.[88] Defendants' motion for judgment on the pleadings as to Count V is denied.

## F.    Count VI:  Entire Fairness

Count VI claims that each of the director defendants are interested in the Merger and so bear the burden of establishing that the Merger was entirely fair to the common stockholders.  Defendants respond that because Plaintiff has not

---

[87] *Raab v. Villager Indus., Inc.*, 355 A.2d 888, 895 (Del. 1976).  *Raab* dealt with an older version of the appraisal statute but its directive regarding "specific instructions" is good law, as shown by later decisions applying the same principle.  *See Enstar Corp. v. Senouf*, 535 A.2d 1351, 1357 (Del. 1987) (observing that "proper instructions are material" and that "they were in fact given here"); *Andrew & Suzanne Schwartz 2000 Family Tr. v. AM Apparel Hldgs., Inc.,* 2008 WL 2877804, at *7 (Del. Ch. July 28, 2008) (citing *Raab* and stating "[b]ecause the March Information Memorandum did not attach a copy of § 262 of the DGCL and it did not contain specific instructions to its stockholders as to the correct manner of executing and filing a valid objection or demand for payment, it did not constitute an effective Notice under § 262(d)(2)." (citations omitted)); *In re Appraisal of Shell Oil Co.*, 1986 WL 2635, at *1 (Del. Ch. Feb. 21, 1986) (ruling defendants had "a fiduciary duty to the former stockholders of Shell to see that they are given sufficient information to enable them to perfect their statutory appraisal rights").  *See also Berger*, 976 A.2d at 144 n.30 (citing *Raab* approvingly).

[88] The parties did not brief, and this decision does not resolve, whether the director defendants' failure to cause the Company to provide timely notice under Section 228 constitutes and independent breach of the duty of disclosure.

30

alleged—and, they say, cannot allege—that the Merger was at an unfair price, Plaintiff has not stated a claim for breach of fiduciary duty.

"The concept of fairness has two basic aspects: fair dealing and fair price."[89] Fair dealing addresses "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[90] Fair price concerns "the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[91]

Although entire fairness review has two aspects, the analysis is not bifurcated. Rather, entire fairness "entails a unitary, non-bifurcated assessment of whether there was both fair dealing and fair price. In making that assessment, the Court must consider all relevant components, first singly and then together as a whole."[92] "A strong record of fair dealing can influence the fair price inquiry, reinforcing

---

[89] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[90] *Id.*

[91] *Id.*

[92] *Seagraves*, 1996 WL 159626, at *3 (citations omitted). *See also Weinberger*, 457 A.2d at 711 ("[T]he test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness."); *Owen v. Cannon*, 2015 WL 3819204, at *32 (Del. Ch. June 17, 2015) ("Under the entire fairness standard, I must make a unitary conclusion as to whether the Merger was entirely fair.").

the unitary nature of the entire fairness test. The converse is equally true: process can infect price."[93] In short, "the fair process and fair price aspects interact."[94]

In the context of a motion to dismiss, "[t]he possibility that the entire fairness standard of review may apply tends to preclude the Court from granting" a defendant's motion.[95] To achieve that uncommon result, the party bearing the burden of demonstrating entire fairness must be "able to show, conclusively, that the challenged transaction was entirely fair based solely on the allegations of the complaint and the documents integral to it."[96]

This decision assumes that Defendants will bear the burden of demonstrating entire fairness; Defendants have not argued anything to the contrary.[97] In an effort to demonstrate entire fairness at the pleadings stage, Defendants contend that Merger price as a whole was indisputably fair, and that the Company would have needed to

---

[93] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 467 (Del. Ch. 2011) (citation omitted). *See also Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *37 (Del. Ch. July 6, 2018) ("[A]n unfair process can taint the price." (citations omitted)).

[94] *Basho Techs.*, 2018 WL 3326693, at *37.

[95] *Klein v. H.I.G. Capital, LLC*, 2018 WL 6719717, at *16 (Del. Ch. Dec. 19, 2018). *See also Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *15 (Del. Ch. July 26, 2018) (applying entire fairness "typically precludes dismissal of a complaint under Rule 12(b)(6)" (citing *Orman v. Cullman*, 794 A.2d 5, 21 n.36 (Del. Ch. 2002)).

[96] *Klein*, 2018 WL 6719717, at *16 (quoting *Hamilton P'rs, L.P. v. Highland Capital Mgmt., L.P.*, 2014 WL 1813340, at *12 (Del. Ch. May 7, 2014)).

[97] For purposes of this motion, Defendants have assumed that entire fairness applies to the merger. This decision adopts the same assumption.

obtain a price more than 50% higher than Merger price before common stockholders would receive any Merger consideration.[98]

Though uncited, Defendants' theory is a tip of the cap to *In re Trados Inc. Shareholder Litigation*, where this Court concluded post-trial that if the "common stock had no economic value before the Merger, then the common stockholders received the substantial equivalent in value of what they had before, and the Merger satisfies the test of fairness."[99]

*Trados*, however, was decided post-trial. At the pleadings stage, Defendants are not entitled to a comparable finding. The allegations in the Complaint are accepted as true for the purpose of this motion. The Complaint alleges that one of the previously explored deals included the potential of greater consideration, such that common stockholders could have received payment, even if only through an earn-out.[100] When combined with the allegations concerning the process, which Defendants do not address, it is reasonably conceivable the Merger was not entirely fair. Defendants are not entitled to judgment on Count VI at this time.

---

[98] Again, Defendants claim the price at which common stockholders would receive consideration was $53,189,000, as compared to the $33.8 million Merger price Plaintiff alleges. *Compare* Am. Ans. Ex. 1 (Suppl. Notice) at 6, *with* Compl. ¶ 1.

[99] 73 A.3d 17, 76 (Del. Ch. 2013) (citation omitted).

[100] Am. Ans. Ex. 1 (Suppl. Notice) at 4.

## III. CONCLUSION

For these reasons, as to the portion of Count II concerning form-dating issues, Defendants' motion for judgment on the pleadings is GRANTED. The remainder of Defendants' motion is DENIED.[101]

**IT IS SO ORDERED.**

---

[101] Defendants oppose class certification, though Plaintiff has not moved for class certification. Defs.' Opening Br. at 42–44. Defendants argue that there are only twenty potential class members and so Plaintiff cannot meet the numerosity requirement of Court of Chancery Rule 23(a). Plaintiff responds by contesting Defendants' factual assumptions. In reply, Defendants "for the sake of judicial economy" agreed that the question could "be decided, if necessary, at a later date." Defs.' Reply Br. at 26. Accordingly, this decision does not address the issue of class certification.